In the Matter of the Application to Punish WILLIAM BARNES, JR., Respondent, as for a Contempt.

HOWARD R. BAYNE et al., Composing a Special Investigating Committee of the Senate of the State of New York, Appellants.

Contempt — witness — investigation of municipal affairs by legislative committee — when witness not guilty of contempt for refusal to answer questions and produce books of business corporation — constitutionality of section 856 of Code of Civil Procedure.

1. Punishment for contempt by summary conviction, either upon a rule to show cause, or by attachment in the first instance, was at common law inherent in courts of justice and legislative assemblies, and in that principle is found the source of the provision in the Revised Statutes in which section 856 of the Code of Civil Procedure originated.

2. This proceeding was instituted under section 856 of the Code to punish the respondent for an alleged contempt in refusing to produce certain books and papers and to answer certain questions propounded to him, upon a hearing before a senate committee which was charged with the duty of investigating certain alleged abuses in the various public offices and departments connected with the municipal government of the city and county of Albany. This section provides that if a person "subpœnaed and attending or brought * * * before an officer or other person or a body," as prescribed in the preceding sections (854, 855), "refuses without reasonable cause to be examined, or to answer a legal and pertinent question, or to produce a book or paper, which he was directed to bring by the terms of the subpœna, * * * the person issuing the subpœna, if he is a judge of a court of record, or not of record, may forthwith, or if he is not, then any judge of such court may, upon proof by affidavit of the facts, by warrant commit the offender to jail, there to remain until he submits to do the act which he was so required to do, or is discharged according to law." *Held*, that this section may be so construed as to require notice to one charged with contempt, and that when read in connection with the provisions of the Judiciary Law relating to criminal contempts its provisions are constitutional and valid.

3. The right to compel a witness to produce the books of a corporation of which he is the president turns upon whether their production is necessary to an inquiry set on foot through a legislative committee, and when such a committee has all the information upon the subject of the inquiry in which it is engaged that is necessary for its general purposes, to allow an examination into the business of a corporation generally as it would be revealed in its books, is improper and without jurisdiction. Hence, this was not a proper case for compelling the witness to produce the corporate books within the provisions of section 854 of the Code.

4. Section 856 provides, as a condition for invoking the aid of the court, that the questions which are propounded to the witness shall be "pertinent;" that is, they must be pertinent to an inquiry of the investigation committee into the necessity for remedial legislation.

5. The witness, who is described as the "leader" of the dominant political party in Albany county, is the owner of stock in the J. B. Lyon Company, a corporation which had dealings for a number of years with the officials and municipal departments of the city of Albany. He refused to answer the questions: " (1) Mr. Barnes, you got your stock (referring to the stock of the Lyon Company) in 1901, is not that true ? (2) Did you pay anything for your stock in the Lyon Company ? (3) Did you talk to Mr. Lyon about the consideration that you paid for your stock at the time that you saw him ? (4) Did you pay anything for it ? (5) Was it given to you ?" *Held*, that these questions were not legal and pertinent within the provisions of section 856 of the Code.

*Matter of Barnes*, 147 App. Div. 396, affirmed.

(Argued December 18, 1911; decided January 16, 1912.)

APPEAL from an order of the Appellate Division of the Supreme Court in the third judicial department, entered December 4, 1911, which reversed an order of Special Term directing the respondent herein to answer certain questions propounded to him by a senate investigating committee and to produce before said committee certain books and papers.

The facts, so far as material, are stated in the opinion.

*James W. Osborne* and *Arthur T. Warner* for appellants. Section 856 of the Code of Civil Procedure is con-

stitutional. (4 Black. Comm. 288; 1 Sm. Ch. Pr. 428, 429; Wigmore on Evidence, §§ 2190, 2191, 2290; *Rex* v. *Almond*, Wilmot, 254; *Battys* v. *Gresley*, 8 East, 319; *Murray* v. *Hoboken Co.*, 18 How. Pr. 277; *Worcester* v. *Truman*, 1 McLean, 483; *Schoonmaker* v. *Gillett*, 3 Johns. Ch. 311; *Elliott* v. *Halmarck*, 1 Mer. 302; *Crow* v. *State*, 24 Tex. 12; *Andrews* v. *Andrews*, 2 Johns. Cas. 109; *Hull* v. *L'Eplettimur*, 49 How. Pr. 500; *Dias* v. *Merle*, 2 Paige, 495; *Riggs* v. *Whitney*, 15 Abb. Pr. 388; *People* v. *Wilson*, 64 Ill. 195; *Middlebrook* v. *State*, 43 Conn. 267.) The five questions asked the witness were "legal and pertinent." (*Briggs* v. *MacKellar*, 2 Abb. Pr. 30; *Wilckens* v. *Willett*, 1 Keyes, 525; *Kilbourne* v. *Thompson*, 103 U. S. 168; *People ex rel. McDonald* v. *Keeler*, 99 N. Y. 485; *Matter of Chapman*, 166 U. S. 161; Wigmore on Evidence, § 2192; *Ex parte Parker*, 74 S. C. 466; *Burnham* v. *Morrissey*, 14 Gray, 238; *Lowe* v. *Summers*, 69 Mo. App. 637; *Ex parte McCarthy*, 29 Cal. 406.) The books of the Journal Company, showing transactions with the various departments of the city and county of Albany and with persons and. corporations transacting business with said city and county, were relevant to the inquiry and were properly subpœnaed. (*Bull* v. *Loveland*, 10 Pick. 9; *Wilson* v. *United States*, 221 U. S. 361; *Matter of Law*, 14 Abb. Pr. 443.)

*William M. Ivins* and *Edgar T. Brackett* for respondent. Section 856 of the Code of Civil Procedure is unconstitutional. (*Matter of Grout*, 105 App. Div. 98; *Ives* v. *S. B. Ry. Co.*, 201 U. S. 292; *Zeigler* v. *S. & N. A. R. R. Co.*, 58 Ala. 594; *Matter of Jacobs*, 98 N. Y. 98; *Bertholf* v. *O'Reilly*, 74 N. Y. 509; *Matter of Davies*, 168 N. Y. 105.) The *subpœna duces tecum* involved in the present application is issued under section 854 of the Code of Civil Procedure. Even assuming the constitutionality of section 854 as applicable to an investigation

in aid of legislation, the subpœna was not issued "in a proper case." (*Matter of Foster*, 139 App. Div. 769; *Boyd* v. *U. S.*, 116 U. S. 616; *I. C. Comm.* v. *Brimson*, 154 U. S. 447.) The questions, upon refusal to answer which this application was made, were improper and irrelevant. (*Harriman* v. *I. C. Comm.*, 211 U. S. 407.)

GRAY, J. This is an appeal from an order of the Appellate Division, in the third department, which reversed an order committing William Barnes, Jr., to jail for refusing to answer certain questions, propounded to him, as a witness, by a committee of the senate of the state, and which denied the motion for his commitment.

On July 21st, 1911, the senate and assembly of the state adopted a concurrent resolution, which authorized the appointment of a special committee of the senate with power to investigate certain charges, which had been made concerning the administration of the various offices and departments connected with the city and county of Albany, and to report to the senate thereon, with such recommendations as in its judgment the public interests require. Power was conferred to compel the attendance of witnesses and the production of books and papers. The charges to be investigated were, in substance, that grave abuses exist in the departments of the county and of the city; that they were corrupt; that the laws and municipal ordinances, relating to the prevention of crime and to the maintenance of peace, order and morality, were not strictly enforced, or were enforced with partiality; that the departments were "conducted with the object of personal gain," dishonestly, with "discriminations against the citizens" and with extravagance. The committee, in the course of its investigations, had before it, as a witness, under subpœna, William Barnes, Jr. He refused to answer certain questions addressed to him and, also, though subpœnaed thereto, refused to produce the ledgers and books of original entry showing

[204 N. Y.]          Opinion, per Gray, J.          [Jan.,

the business of the Journal Company, a corporation of which the witness was the president. He raised no other question, except with relation to the right of the committee to ask the questions, or to compel him to submit the books. Thereupon an order was granted by a justice of the Supreme Court, which required Barnes to show cause, at a time and place named, why a warrant should not issue for his commitment to jail, until he answered the questions and produced before the committee the books specified. Upon the hearing, on the return to the order, it was ordered that a warrant issue committing the witness, until he answered certain five of the questions propounded and produced the books of the Journal Company, showing its business "with various departments of the City and County of Albany *and with persons and corporations transacting business with said City and County for the past ten years.*" Barnes, alone, appealed from this order and, thus, the judicial inquiry is restricted to the pertinency of the five questions and to the propriety of compelling the production of the corporate books.

The majority of the Appellate Division justices held the provisions of section 856 of the Code of Civil Procedure, under which the proceeding was brought, to be unconstitutional; inasmuch as the section "contemplates no notice to the alleged offender." That section reads, so far as material: "if the person subpoenaed and attending * * * before an officer or other person or a body refuses without reasonable cause to be examined, or to answer a legal and pertinent question, or to produce a book or paper, * * * any judge of such court (court of record) may upon proof by affidavit of the facts by warrant commit the offender to jail, there to remain, until he submits," etc. The decision of the Appellate Division followed, without discussion, the authority of *Matter of Grout*, (105 App. Div. 98); where the Appellate Division, in the second department, had

held that the section operated to deprive the witness of his liberty without due process of law; because it did not provide for notice to him and for an opportunity to be heard. Previously, the General Term, in the first department, in *Matter of McAdam*, (7 N. Y. Suppl. 454), had upheld the constitutionality of the section. In that case, Justice VAN BRUNT, speaking for the court, held that "the practice of summary commitments has prevailed ever since the Revised Statutes were adopted * * *. Such a procedure in the case of a witness has been recognized for a sufficient length of time to bring it within the category of 'due process of law.'" (p. 456.) The court below held itself "constrained to follow the *Grout* case, as the latest decision of a court of co-ordinate jurisdiction." This question, therefore, first presents itself to us and I am of the opinion that Mr. Justice KELLOGG, at the Special Term, correctly held the provisions of the section to be constitutional. In his view, and I think it the correct one, the proceeding to punish a contumacious witness was always summary and expeditious, and necessarily so, in order to prevent delay in the administration of justice. The substance of this section of the Code was taken from the Revised Statutes, (2 R. S. 401, sec. 47), and there never has been any limitation of the law, with respect to the witness, requiring notice preliminary to his commitment for contempt. (1 Rev. Laws, 457, sec. 5, and Laws of 1807, chap. 130, sec. 4.) This statute is, and always has been, a valuable instrumentality in the administration of justice and the enforcement of laws. Punishment for contempt by summary conviction, either upon a rule to show cause, or by attachment in the first instance, was deemed at common law to be inherent in courts of justice and legislative assemblies. (See *Yates* v. *Lansing*, 9 Johns. 395–416; 4 Blackst. Com. 286.) As a principle of the common law of England, it became a part of our common law and in that principle is found the source of the provision in the Revised Stat-

8

utes, in which section 856 originated. The adoption of the provision should, justly, be regarded as not contravening any constitutional provision. Until the decision in the *Grout Case, (supra)*, its constitutionality had not been questioned by any decision, of which I am aware.

Besides, I think that a witness has all the protection he is entitled to — as much as if notice was expressly required to be given him — in the peculiar and explicit language of the section. That is, he may not be committed to jail, unless he "refuses *without reasonable cause* to be examined, or to answer a *legal and pertinent question*, or to produce a book, or paper," etc. This provision requires of the judge that he first determine whether the refusal of the witness, in question, was, or was not, with reasonable cause and whether the question asked was pertinent, and that, necessarily, imports that the witness has been heard from upon the reasonableness of his refusal. Due process of law has been defined "as law in its regular course of administration through courts of justice." (2 Kent. Com. 13.) It seems to me, as it was held in *Happy* v. *Mosher*, (48 N. Y. 313, at p. 317), that it is a sufficient notice when the party proceeded against "will be apprised of what is going on against him, and an opportunity is afforded to him to defend." (And see *People ex rel. McDonald* v. *Keeler*, 99 N. Y. 463, at p. 479.) It would be, indeed, unfortunate for the administration of justice, if it should, now, be held that this statutory provision is invalid, when, as Mr. Justice KELLOGG well observed, a fair reading of the section, "both with regard to its working and its purpose, permits a construction, which would uphold as constitutional this most necessary provision of law." The objection urged is, as it seems to me, excessively technical, in view of the provision I have called attention to, which prescribes, as a condition precedent to the commitment of the witness, that the committing judge shall determine the reasonableness of the witness' cause for refusing to testify. Without greater

elaboration of the question, I am, unhesitatingly, of the opinion that the provisions of section 856 are constitutional and valid.

That each house of the legislature may punish contempts of its authority by other persons, where they are committed in its presence, may not be disputed and, equally, may it be a contempt of the house for a witness to refuse to appear, or to testify, before its duly empowered committee, or to produce books, or papers. (Cooley's Const. Law. *135; *People ex rel. McDonald* v. *Keeler*, *supra*.) Sections 854, 855 and 856 of the Code of Civil Procedure were enacted to make provision for such an attendance of a witness before a committee of either house and for his punishment when contumacious. Section 854 provides for requiring by subpœna his attendance and that he bring with him a book, or paper, "*in a proper case*." Section 856 provides, as a condition of invoking the aid of the court, that the question, which is propounded to him, shall be "legal and pertinent."

Taking up the question of the right to compel the witness to produce the books of the Journal Company, of which he was the president, I think it turns upon whether their production became necessary to the inquiry set on foot through the legislative committee. If the evidence before that body was a sufficient showing of the character of the dealings, and of the methods of the company in transactions, with the departments of the city and county government, then I think it was not, in the language of section 854, "a proper case" to insist upon laying bare the corporate books. The committee wanted such evidence of abuses, or of corrupt practices, or of such official misconduct, as would enable it to "report the information required by the resolution * * * with such recommendations as the public interests require." It was not a proceeding against the corporation itself; for it was brought into the investigation incidentally to a general inquiry into the conduct by the officers of the municipal government. The

committee was not collecting evidence to visit the corpora-ation with pains and penalties. It was an investigating body seeking material for general legislation. Unquestion-nably, as a creature of the state, the corporation received its franchises and privileges subject to the laws of the state and the limitations of its charter. In a proper proceeding insti-tuted by the People, through their law officer, against the corporation, or its officers, it might be perfectly proper to investigate its doings and its exercise of powers, and, to that end, to go through its books and papers. It must sub-mit them, if the proceeding be one to investigate alleged violations of its charter and to inquire into causes of for-feiture for abuses of its powers, or privileges, and it cannot refuse upon the ground of self-crimination, as may the individual. What the citizen may refuse to do is refer-able to his constitutional rights; but a corporation does not stand on the same ground. It receives its charter, subject to the reserved right of the legislature to inquire into the exercise of the franchises and privileges con-ferred. Therefore it is that when the witness, Barnes, refused to produce, or to allow to be produced, the cor-porate books, his refusal cannot be supported on any other ground than that the committee had all the information upon the subject of the inquiry touching the Journal Company's relations with the city and county depart-ments that was necessary for its general purposes and that to allow an examination into the business of the company, generally, as it would be revealed in its books, was improper and without jurisdiction. The evidence showed the practices of the company in its transaction of the public business and its methods in dealing with public officials, sufficiently, for the committee to frame recommendations, if any were deemed needful, for further legislation in the public interest. It appeared in evidence that the Journal Company published the Albany *Evening Journal*, a daily newspaper, in the city of Albany. The Argus Company had the contract to print the proceedings

of the common council and the reports of the various officers and departments of the city. These would be kept in type. Copies would be ordered from the Journal Company by officials, which would obtain them from the Argus Company. The Journal Company would deliver them and receive twenty-five per cent of the cost price, without other service than turning over the order to the Argus Company. The Argus Company, also, paid to the Journal Company fifteen per cent of the amount received by it from its printing contracts. Printing for the city officials was done by the Journal Company without competitive bidding, by dividing an order, when in excess of $250, the figure at which competitive bidding was necessary for city work. The Journal Company had been paid by the state for bills, after audit by the state comptroller, for the printing of the Session Laws for a period of twelve years, when, as it is charged, it had done no such printing, except as it was done from forms purchased from others. These facts had been testified to and Barnes offered to furnish the committee with true copies, verified, of the contents of the corporate books, which showed all the dealings for the period in question with the city and county, and with their officials.

This was no occasion for going through the corporate books for the purpose of fishing for other facts, which might reflect discreditably upon the business methods of the company; with the result of exposing its business dealings to the world. In *Wilson* v. *U. S.*, (221 U. S. 361), the only question was stated, in the opinion, to be, "whether *as against the corporation* the books were lawfully required in the administration of justice." In that case, officers of the corporation had been indicted for alleged violations of the statute in a misuse of the mails. In *Hale* v. *Henkel*, (201 U. S. 43), the contumacious witness was examined with reference to an action pending between the United States and a corporation, of which he was an officer. Therefore, neither of these decisions

is applicable to the decision of the question here. I think that with the information furnished, and offered to be furnished, the committee unwarrantably insisted upon an examination of all the entries in the corporate books. Having the admissions and knowledge, which the evidence afforded it, whatever conclusion it might lead to, to permit the committee to proceed to the desired length would be unnecessary to the object of its inquiry and make offensively inquisitorial a proceeding not visitatorial in its nature, in the sense of being instituted for the inspection and control of the corporation itself. I think it was not "a proper case" for compelling the witness to bring the corporate books.

The five questions, which the witness refused to answer and which are now involved, are these: "(1) Mr. Barnes, you got your stock, (referring to the stock of the Lyon Company), in 1901, is not that true? (2) Did you pay anything for your stock in the Lyon Company? (3) Did you talk to Mr. Lyon about the consideration that you paid for your stock at the time that you saw him? (4) Did you pay anything for it? (5) Was it given to you?" The J. B. Lyon Company was a corporation, which had furnished the county of Albany with printing for a period of ten years, and Barnes was the owner of 750 out of an issue of 3,000 shares of capital stock. He testified to having been a "leader" of the Republican party, a party for some years dominant, politically, in Albany county; employing that term, as he said, to mean "a man whose advice is taken largely by the men of the political party, with whom he is associated." As stated by Justice KELLOGG, at the Special Term, "the investigation was being had as to whether a person in that position had acquired a substantial stockholding interest in a company, which furnished printing to a large amount to the political subdivision in which he was a figure of power, without any adequate compensation therefor, and whether this species of patronage had been given to the company in return

for an ownership, or interest." Granting that it was the fact and that the stock was given to Barnes, it was his private affair and, notwithstanding his position in the political world as a "leader" of his party in the county, I think that the committee exceeded the true scope of its jurisdiction, when seeking to elicit such evidence by their questions. He violated no law in receiving the stock as a gift, whatever the giver's motive, and his interest was of . that magnitude, however acquired, as to warrant the presumption that it might influence him in doing all that his prominent position in the community enabled him to do to obtain for the company a share of the public business. The fact of his interest in a company, which was contracting and dealing profitably with the municipal departments and public officials, was made known and the committee could make such inference, and deduce such conclusions therefrom for its report, as its members might deem to be justified. The committee could not be aided, within the proper legislative province of its inquiry, by the knowledge of how Barnes had obtained his stock. He owned it and the time when he got it, or the consideration for it, were matters quite immaterial and beyond the jurisdiction of the committee to inquire into. Section 856 requires that the questions to be answered shall be "pertinent;" that is, they must be pertinent to an inquiry of the investigating committee into the necessity for remedial legislation. "No person can be punished for contumacy as a witness before either house unless his testimony is required in a matter into which the house has jurisdiction to inquire, and * * * neither of those bodies possesses the general power of making inquiry into the private affairs of the citizen." (*People ex rel. McDonald* v. *Keeler*, 99 N. Y. 463, at p. 478.) This was observed with respect to the houses of Congress; but the remark is equally applicable to those of the state legislature. If Barnes had the right to acquire an interest in the Lyon Company, which may not well be disputed, and used his

political influence in aid of its business, the committee has the fact and is able to form its own conclusions as to the desirability of recommending any further remedial legislation, in aid of a moral, economical and efficient administration of government by the municipalities of the state. To find out whether Barnes paid for his stock, or not, would not aid the legislative body in that respect. With the morality of Barnes' act the legislature is not concerned; at most, its concern is in suggesting safeguards, if further ones be needed, against the improvident contracts of municipalities and the extravagance, or corrupt practices, of their officials.

Assuming that the various matters for investigation recited in the extremely broad resolution of the legislature are within the legitimate scope of a legislative inquiry, a question which is not discussed, I think that it was not "a proper case" for compelling the production of the books of the Journal Company, within the provisions of Code section 854, and that the questions which the witness was directed to answer were not "legal and pertinent," within the provisions of Code section 856.

For these reasons, I advise the affirmance of the order of the Appellate Division.

WERNER, J. This is a proceeding to punish the respondent, William Barnes, Jr., for an alleged contempt in refusing to produce certain books and papers, and to answer certain questions propounded to him, upon a hearing before a senate committee which was charged with the duty of investigating certain alleged abuses in the various public offices and departments connected with the municipal governments of the city and county of Albany. The proceeding was instituted under section 856 of the Code of Civil Procedure, which provides that if a person "subpœnaed and attending or brought * * * before an officer or other person or a body" as prescribed in the preceding sections (854, 855) "refuses without

reasonable cause to be examined, or to answer a legal and pertinent question, or to produce a book or paper, which he was directed to bring by the terms of the subpœna, * * * the person issuing the subpœna, if he is a judge of a court of record, or not of record, may forthwith, or if he is not, then any judge of such court may upon proof by affidavit of the facts by warrant commit the offender to jail, there to remain, until he submits to do the act which he was so required to do, or is discharged according to law." The import of this section can only be ascertained by referring to section 854 which provides, among other things, that "a committee of either house of the legislature, or a joint committee thereof, duly empowered by resolution or act to sit and take testimony during the session thereof, or after the adjournment thereof," may issue a subpœna "by and under the hand of * * * or the chairman or a majority of the board or committee," requiring a person to attend, and in a proper case to bring with him a book or a paper.

The respondent was duly subpœnaed, and directed to produce certain books, which he refused to do, and asked to answer certain questions, which he refused to answer, not contumaciously, but because he challenged the right of the committee to require him to produce the specified books, or to answer the particular questions. Thereupon an application was made to a justice of the Supreme Court for an order to show cause why a warrant should not issue to apprehend the respondent, and to commit him to the jail of Albany county, there to remain until he should produce such books and answer such questions. Upon appeal to the Appellate Division, a majority of the justices held that section 856 of the Code of Civil Procedure is unconstitutional because it provides for no notice to the alleged offender, and is, therefore, repugnant to the "due process" clause of the Constitution. This conclusion was based upon the authority

*Matter of Grout* (105 App. Div. 98), and reference to *Matter of McAdam* (7 N. Y. Supp. 454). In the *McAdam* case the General Term of the first department held that a summary commitment was valid, and that no notice was necessary to constitute due process of law. In the *Grout* case the Appellate Division of the second department held that notice is necessary to constitute due process of law and the section of the Code (856) is invalid because it contains no provision for notice.

Upon this appeal from the order of the Appellate Division, our brother GRAY has written an opinion in which he holds that under section 856 a summary conviction without notice violates no constitutional right; and that even if notice were necessary, we can read into the language of the section a provision requiring notice to be given. I dissent from the first of these two propositions but concur in the last. I think the language of section 856, which is by no means clear, may be so construed as to require notice to one charged with contempt, and that when read in connection with the provisions of the Judiciary Law relating to criminal contempts, the question is removed from the realm of doubt.

Conceding, for this branch of the discussion, that this proceeding stands upon the same footing as any similar proceeding to punish for an alleged contempt in a court of record, we have only to refer to the Judiciary Law (Sec. 750, subd. 3) to ascertain that the offense charged against the respondent is a criminal contempt; and a contempt which is within that classification can only be punished summarily when committed within the immediate view and presence of the court. (Judiciary Law, sec. 751.) The obvious reason for this provision is that in such a case the court is a witness to the contempt and needs no further proof. The same section of the Judiciary Law provides that a person charged with a criminal contempt not committed in the immediate view and presence of the court, can only be punished after having

been notified of the accusation and the lapse of a reasonable time to make a defense. Unless we read into section 856 of the Code of Civil Procedure a provision for notice in cases of alleged contempts not committed in the immediate view and presence of the court, we have two statutes covering the same subject, and yet so diametrically opposed to each other that they cannot stand together. Under a fair construction of section 856 of the Code of Civil Procedure we may hold that it provides for notice. A careful reading will disclose the sharp antithesis between a case in which a judge has issued the subpœna, and one in which the subpœna is issued by another officer or body. In the one case the judge who has issued the process may forthwith issue a warrant; in the other, when the subpœna was issued by an officer or body having no power to commit or punish for contempt, the judge can only proceed "upon proof by affidavit of the facts." These words do not confine the proof to the affidavits of the accusing party, but should be held to embrace the evidence which the accused may furnish within such reasonable time as the court may fix. This construction of section 856 of the Code of Civil Procedure does no violence to its language, brings it into harmony with the explicit provisions of the Judiciary Law, and assures to every citizen charged with a contempt the most literal protection which the "due process" clause of the Constitution guarantees.

Unless we can read into section 856 a provision for notice, either by force of its own language or in connection with the mandates of the Judiciary Law, I regard the Code section to be plainly unconstitutional. We are not now concerned with the ancient and inherent powers of courts of record, or with the prerogatives of supreme legislative bodies, but with the law as we find it on our statute books. Conceding the inherent powers of these governmental agencies, it cannot be denied that it is an anomaly in legal procedure to impose upon one tribunal

the duty to punish for contempts committed in another. That is precisely what the legislature has done in enacting section 856 of the Code in its present form. The Code provisions in which that section is found were taken over from the Revised Statutes. In their original form they related wholly to contempts against the dignity and the process of courts of record. By various amendments their provisions were extended to courts not of record, and to other officers and bodies authorized to issue process to compel attendance of witnesses and the taking of testimony, but having no power to punish for contempt. Not until 1900 was section 854 of the Code amended so as to include among the officers or bodies empowered to issue subpœnas " a committee of either house of the legislature or a joint committee thereof:" By adding this provision to the section, and leaving the rest as it stood before, the legislature divested itself of any inherent power to punish as for a contempt in disobedience of its process, and vested that power in a judge of a court. A judge, in such a proceeding, is called upon to punish for a contempt alleged to have been committed, not in his view or presence, nor in defiance of process issued by him or his court, but before a legislative body. The only knowledge or information which a judge can lawfully acquire in such a proceeding, upon the question whether a contempt has been committed, is by proof in the form of affidavits or testimony, and if the statute is to be construed as denying to the accused any right to be heard, I think it is clearly unconstitutional.

It has been suggested that the warrant provided for in section 856 is not the final adjudication inflicting punishment, but merely an intermediate writ under which the alleged offender is taken into custody until he "submits to do the act which he was so required to do or until he is discharged according to law." It would be difficult if not impossible to imagine any more summary or effectual method of depriving a person of his liberty than to take

him into custody without notice, transport him to a common jail and keep him there until "he submits to do the act" which is required of him. It matters little by what name such a mode of procedure is known. It is a deprivation of liberty, and if it is not upon notice it is not due process of law. For these reasons I vote to construe section 856 as providing for notice, and so construed it is clearly constitutional.

Upon the other questions in the case I concur in the views expressed by Judge GRAY. The statute (Section 856) directs that if a person subpœnaed, etc., refuses without reasonable cause "to answer a legal and pertinent question" he may be dealt with according to its provisions. What is a legal and pertinent question? Obviously one that violates no legal right of the witness, and that is pertinent — that is relevant and material — to the purpose of the proceeding or investigation in which the witness is being examined. If the question goes beyond this limitation it is illegal and impertinent and the witness cannot be compelled to answer it. Who is to decide whether a question is legal and pertinent? If a legislative committee or its counsel are to be the final arbiters upon this important limitation, it is an idle ceremony to appeal to the courts. It seems to me that the plain import of the words "legal" and "pertinent" as used in the statute is to confine the proceeding within lawful bounds and proper methods with respect to the legal rights of the individual who is called upon to testify, and when he challenges the legality and pertinency of the information sought from him, it presents a question of law for the courts to decide. If we were concerned merely with the cumulation of pertinent testimony, I should agree with our brother BARTLETT that the courts should not attempt to substitute their judgment for the discretion of a legislative committee. But that is not the question. We are to decide (1) whether a private citizen can be compelled to divulge to a legislative investigating

committee his purely private and personal affairs when it is not perceivable that the inquiry into such matters is within the scope of the declared purpose of the investigation, and (2) whether the books of a corporation in which a witness is a stockholder must be produced for unlimited examination, when the only information of pertinent public interest to be obtained therefrom is either already in the possession of such committee or has been offered to it.

The five oral questions which the respondent refused to answer all relate to his ownership of stock in the J. B. Lyon Printing Company, and were asked for the purpose of ascertaining how and when he got the stock, and what he paid for it, if he paid anything. It is charged that for a number of years the J. B. Lyon Company had been paid large sums for county printing without public bidding at the instance of Republican county officials; and that it had also done a large amount of city printing either directly upon the orders of city officials, or indirectly upon orders received through the Journal Company. The innuendo is that these things were done at the instance of the respondent, an influential political leader and a large stockholder in both printing companies. If there was anything illegal or morally culpable in the transactions between either of these corporations and the county or city officials or departments, it would not be more so because the respondent had received stock as a gift, and it would not be less so if he had paid full value for it. In either event, the legitimate and pertinent inquiry would be as to the character of the transactions, and not as to the motives of the persons connected with them. Neither would the answers to any of these questions throw any light upon the propriety or necessity for recommending future legislation designed to regulate, limit or forbid the letting of municipal contracts to corporations having stockholders of political influence who have paid nothing for their stock. If that

is an evil which can be reached and remedied by legislation, no amount of probing into the private affairs of any individual can make the necessity for such action more apparent or urgent.

What has been said concerning the oral examination of the respondent applies with equal force to the effort to compel the production of the books of the Albany Journal Company. The charges against that corporation are to the effect that the corporation received large sums for the printing of Session Laws when in fact it had rendered no such service; that for several years the Journal Company received from the Argus Company fifteen per cent of the amount paid to the latter by the city of Albany for city printing, and that this was done not in payment for any service performed but as a bonus or gratuity; that the Journal Company for several years received orders for city printing without competitive bids; and in some instances in violation of the city charter arranged to so subdivide these orders as to obviate the necessity for public bidding. It is not contended that the books of the Albany Journal Company would disclose any facts which would substantiate these charges; on the contrary, the assertion is that they have been established by other evidence. The respondent offered to give the committee true sworn copies of the Journal Company's books covering all dealings between the corporation and the city or county of Albany, but that offer was declined. The charges in this behalf were definite, and we have the word of counsel for the committee that they were proven. In that aspect of the matter the committee needed no further information, and even if it did, it declined the respondent's offer to furnish the only further evidence that was pertinent to the charges. It is no answer to say that extracts from the books might not have shown the true state of affairs. If it is true as charged, that the Journal Company received payment for work that it never performed and evaded the provisions of the city

charter by subdividing orders or contracts for city printing, the proof of these facts would probably not be found in its books. Even if we could indulge in the assumption that the books of the Journal Company would disclose information which is material to the charges, we should not assume, in a proceeding to punish for a criminal contempt, that the respondent under his offer would not have furnished all that the books contained relative thereto. Had the committee accepted the respondent's offer, and had the sworn extracts from the books indicated that the respondent was not acting in good faith, we would have quite a different question to decide. For these reasons, and for the reasons more fully set forth in the opinion of Judge GRAY, I think the committee went beyond its power in its effort to compel the respondent to answer the five questions which have been discussed, and to produce and disclose the books of the Journal Company.

I vote to affirm the order of the Appellate Division.

CULLEN, Ch. J. (dissenting). I vote for the reversal of the order of the Appellate Division and the affirmance of the Special Term. I concur with Judge GRAY in the view that the provisions of section 856 of the Code of Civil Procedure do not violate the Constitution by depriving the respondent of due process of law. The antiquity of those or similar provisions of the statutes of this state is cogent, if not conclusive evidence, of their constitutionality. In this case the respondent was proceeded against by order to show cause. Personally I do not believe that the proceeding authorized by the Code is punitive in the proper sense of that term, but solely a method of enforcing obedience to a duty imposed upon the respondent by law to give testimony before the committee of the senate. A very clear exposition of the nature of such proceedings is to be found in *Application of Clark* (65 Conn. 17). In this view notice was not necessary.

1912.]     Dissenting opinion, per CULLEN, Ch. J.     [204 N. Y.]

The case is analogous to that of an attachment against a witness who has failed to respond to a subpœna. Such an attachment is granted *ex parte* and the witness subjected to arrest under it. If granted improperly, or if the statements on which it is granted are false, the witness may obtain relief by having the attachment vacated and redress by action against the parties at whose instance the proceeding was instituted. So also in that and in the present case the party might obtain release on habeas corpus. (*Matter of Depue*, 185 N. Y. 60.) I think my brother WERNER is in error in supposing that section 47 of the Revised Statutes (2 R. S. 401), the progenitor of section 856 of the present Code, related only to disobedience committed in the presence of the court, at least, in one instance, that of a person required to attend as a witness before a commission by subpœna issued from another state or county. The party requiring the testimony, on an affidavit of its materiality, would obtain from a judge of the Supreme Court or county judge a summons for the person to attend as a witness (2 R. S. §§ 29, 30, 31, pp. 307, 308), and under sections 44 and 47 (2 R. S. 401) the judge issuing the subpœna was authorized to commit to jail the witness who refused to answer. I am also at a loss to understand how the legislature, by amending the Code of Civil Procedure, divested itself of its inherent power to commit a witness for disobedience to its process. I know of no constitutional or legislative provision effecting this result.

The respondent had a hearing before the committee of the senate appointed pursuant to a joint resolution of the legislature, which decided that the questions were material and should be answered. The legislature could have devolved on this committee itself the power to commit the respondent until he answered the questions propounded to him, if the questions were material and proper (*People* v. *Learned*, 5 Hun, 626; *People ex rel. McDonald* v. *Keeler*, 99 N. Y. 463), while if improper and beyond the jurisdic-

tion of the committee, relief could be obtained by habeas corpus. I cannot see how the present proceeding is rendered unconstitutional because there is added the further safeguard of an application to the court, even though that application be *ex parte*. In *Matter of Superintendent of Poor of Westchester Co.* (6 App. Div. 144) it was held that the Supreme Court could not punish as for a contempt the failure of a witness to appear in answer to a subpœna issued by a board of supervisors nor issue an attachment against the recalcitrant witness for that purpose, but should issue a warrant directing the arrest of the witness and his production before the board.

If I err, however, in this view, and the proceeding against the respondent is to be deemed one to punish him for contempt, then the mode of procedure is controlled by the provisions of the Judiciary Law, which require that, except in certain specified instances, which do not include the one before us, the proceeding must be instituted by either an order to show cause or by an attachment. (Judiciary Law, §§ 753, 754, 755.) These provisions would seem in any aspect of the case to save section 856 of the Code from condemnation as unconstitutional, and, as already said, the proceeding before us was instituted by an order to show cause.

I concur in the opinion of Judge Bartlett that the questions propounded to the respondent by the committee were legal and pertinent. I know of no principle by which testimony on the main issue can be excluded because cumulative. A court may limit the number of witnesses to be sworn on collateral issues, such as character, credibility and the like, but even then the power to so limit the testimony rests in the discretion of the trial court. Improperly limiting testimony may be regarded as error by an appellate court, but I cannot conceive that failure to limit testimony could be considered such, and it must be remembered that in this proceeding the senate committee stands at least in as favor-

able position as a trial court. Indeed, it is much more immune from review. The sole instance in which the courts are justified in interfering with an inquiry by the committee is when the inquiry extends beyond the subject-matter of its jurisdiction.

It is further to be observed that the testimony that the Albany *Evening Journal* received a percentage on the printing or advertising done by the Albany *Argus* was given by persons interested in a newspaper of opposite politics to those of the *Journal*, and though the committee may think that evidence is clear, the object of the investigation is that the legislature may act. It may be that some members of the two houses will not credit the evidence of political opponents, but deem their statements political slanders. Therefore, plainly, the committee had the right to discover from the books of the *Journal* itself whether the payments referred to had in fact been made, and it was not obliged to take statements of the contents of those books but was entitled to see the originals, in conformity with the rule which has always prevailed in courts, that the best evidence must be produced and that the best evidence of the contents of written papers is the papers themselves.

WILLARD BARTLETT, J. (dissenting). I dissent from the conclusion reached by a majority of the court to the effect that the senate committee has not jurisdiction to compel the respondent to answer the questions which he has refused to answer or to require the production of the books and papers which he has been subpœnaed to produce.

I agree that section 856 of the Code of Civil Procedure is constitutional. It does not seem to me necessary to discuss whether or not it would be valid in the absence of any provision for notice to the witness before the issue of a warrant against him, as I think the language of the section fairly imports the requirement of such notice.

As to the questions propounded to Mr. Barnes, it seems to me perfectly clear that he can be absolved from the obligation to answer them only on the ground that they were illegal or not pertinent to the investigation being conducted by the committee.   A witness subjects himself to the procedure prescribed by section 856 of the Code if he "refuses without reasonable cause to be examined or to answer a legal or pertinent question."   I think that the questions put to Mr. Barnes were both legal and pertinent.   They were designed to ascertain whether the witness had paid anything for his stock (amounting to about 750 shares) in the J. B. Lyon Company.   The evidence already taken by the senate committee showed (according to an affidavit in the appeal book) that this corporation had been awarded a large quantity of printing by the county of Albany without public bidding therefor and had also done a large amount of city printing.   No one denies the right of Mr. Barnes to hold capital stock in this printing company or to acquire it for any particular sum or even by gift.   In view, however, of his proved position and influence as the political leader of the party in power in Albany, and in view of the alleged favoritism shown by the public officials toward the J. B. Lyon Company, might not the committee obtain light as to the necessity of remedial legislation in the premises by ascertaining the precise circumstances under which Mr. Barnes acquired his stock ?   I think so.   It might not be possible to legislate against the stockowner; but the awarding of contracts could be regulated by law so as to prevent the public business from going to corporations whose stock had been so acquired or was so held as to justify the inference that political influence would prevail over the public good and thus lead to favoritism and a lax discharge of contract obligations.   I do not say that such conditions actually exist in the present case; I merely assert that they are conceivable; and the answers to the committee's questions might have shown what was the

fact. The test as to their pertinency — which is here the equivalent of relevancy — is whether the answers *could* be such as to aid the committee in discharging its duties; in other words, could they help it to decide whether any new laws were needed to deal with the evils disclosed, and if so what laws? Thus tested, the propriety of the questions seems to me to be established.

But it is said that the committee knew all it needed to know on the subject when Mr. Barnes admitted that he owned about 750 shares, and that it could not aid the committee in framing its report to the legislature to know in what manner Mr. Barnes acquired his stock in the J. B. Lyon Company. I cannot assent to this proposition at all. The gradual acquisition for full value of a substantial interest in a corporation which happened to have business with the municipal government would by no means warrant the unfavorable inferences which might be drawn from the gratuitous bestowal of a large block of stock upon a powerful political leader. The mode of acquisition would make all the difference in the world. Nor do I understand it to be a rule controlling the conduct of a legislative investigation having remedial legislation in view that cumulative evidence cannot be taken. The committee itself may properly decline to receive further proof on a given subject because satisfied that it already has sufficient to enable it to arrive at a satisfactory conclusion; but if it chooses to seek further, the evidence is not illegal or irrelevant merely because it tends to confirm or corroborate or elucidate what has gone before. The "legal and pertinent" questions which the Code requires a witness to answer need not be *essential* to the inquiry; it is enough if they are appropriate to the end in view and do not infringe upon any right of the witness.

It is conceded in the prevailing opinion that the refusal of Mr. Barnes to produce or allow to be produced the corporate books of the Journal Company designated in

the *subpœna duces tecum* cannot be supported on any other ground than that the committee already had all the information concerning the relations of that corporation with the city and county departments which was necessary to enable the committee to frame such recommendations for legislation as the public interest might require; and it is held that to permit the inquiry to proceed to the desired length would make it offensively inquisitorial. I do not believe that the court should substitute its judgment for that of a legislative investigating committee as to the *quantum* of the evidence which it is expedient to take on any particular subject; and the observations which have been made as to cumulative oral evidence apply equally to the production of these papers. The fact that papers thus called for may contain entries relating to the private affairs of the witness has not been deemed a valid objection. (*Burnham* v. *Morrissey*, 14 Gray, 226.) "We know of no rule of law," said the Supreme Judicial Court of Massachusetts in the case cited, "which exempts any person from producing papers material in any inquiry in the course of justice, merely because they are private." Furthermore, it was aptly suggested in the same opinion that if the material entries "were shown to be mingled with others not relating to the matters inquired of, which were private in their nature, such parts only as were relevant might have been exhibited and the other protected from exposure." Assuming, as we are bound to assume, that the committee was actuated only by proper motives in the exercise of its functions, this course could have been followed in the present case with reference to any purely private entries in the books of the Journal Company.

The abuse of the power of official investigation for purposes other than those contemplated by law is a detestable practice calling for the sternest reprobation by all those authorized to deal with it. I find nothing in this record, however, which seems to me to justify the court in holding that the senate committee has attempted any

such abuse or has exceeded its jurisdiction in any respect. This is an important case and for the reasons which have been stated I feel bound to record my dissent from the decision about to be made, in the hope that it may have some influence in preventing any further extension of the doctrine of the prevailing opinion in limiting the evidence receivable in a legislative investigation.

HISCOCK, CHASE and COLLIN, JJ., concur with GRAY, J., as to questions propounded to witness, and with WERNER, J., as to the constitutionality of the statute; CULLEN, Ch. J., and WILLARD BARTLETT, J., read dissenting opinions.

Order affirmed.